ready to hear Cedric Cowell against Garnett 21047 and we'll begin with Ms. Mahadev. Good morning, Your Honors. Shoba Mahadev, Northwestern Pritzker School of Law, Bloom Legal Clinic, on behalf of Cedric Cowell. With the Court's permission, I'd like to reserve two minutes for rebuttal. Just keep an eye on your time. I will. Thank you, Your Honors. May it please the Court, this is an extraordinary case on its facts and on the law. On its facts, Cedric Cowell was wrongfully convicted as a teenager more than 25 years ago on the thinnest shred of evidence generated by a single eyewitness, the victim of the crime, who by his own admission testified falsely out of fear of his life and to protect his family, and he ultimately remained steadfast to his new identification testimony at great penalty to himself. And on the law, Mr. Cowell's case is the exception that is the rule. The United States Supreme Court, as well as this Court, have repeatedly held open the possibility that a claim of actual innocence under an extraordinary set of circumstances could warrant federal habeas relief. Your Honors, in Herrera v. Collins, the United States Supreme Court provided a truly persuasive demonstration of actual innocence. But you would agree, would you not, though, Ms. Mahadov, that although the Supreme Court, I agree with you, has continued to keep the door open a crack for this kind of case, the closest it's ever come to recognizing such a thing is in the Troy Davis litigation, where there was a hearing, and given the factual outcome of the hearing, nothing more happened, and Mr. Davis was executed. So we would certainly be breaking new ground here. I think that's correct, Your Honor, and it is true. I think that analysis is exactly right, that the Court has left the store open, that this Court has left the store open, and it has, you know, hesitated, I guess you could say, to actually provide this relief, because that case has not presented itself in sort of the courts that have examined its views. Isn't an eyewitness case the right one, though? I mean, there's a lot one can say, and has been said by very reputable scientific groups about eyewitness testimony, but the criminal justice system has relied on it for centuries, literally, and if we credit the initial eyewitness accounts, as opposed to the recanted account, then there is sufficient evidence here. I think you're, that's right, Your Honor, that certainly the state courts have relied on eyewitness testimony, even coming forth and saying that a single eyewitness might be enough in cases. We would submit this is an unusual case, Your Honors. There was no physical evidence, there was no confession, there was no DNA. Certainly the argument could be made that a DNA case might be one in which their relief should be given, but DNA cases... How would you get around our recent opinion in the co-defendant case here, that I noticed you didn't mention in your briefs, but there we found, and this is the co-defendant in this case, raising the exact issue about Mr. Johnson's recantation 15 years later, and we found that the co-defendant, Mr. Kirkman, had failed to show by clear and convincing evidence that the recantation was true. Your Honor, admittedly another panel of this court made that finding, but that argument on appeal was centered around the due process claim, although, yes, in the opinion there is some reference to We have no escape, Your Honor. We are taking this issue head-on. To us, this is actual innocence. This is the extraordinary case, and we are mindful of the highly deferential standard. Would we have to disagree with the other panel to reach that decision? I think that might be the case, but except that the focus in that case, Your Honor, again, was on the due process claim, and that is not the claim we are raising here on appeal, Your Honor. We are steadfast in the actual innocence argument. But by claiming actual innocence, you're saying it all relies on Johnson's recantation, and given that, you're still talking about the merits of, or the believability of his recantation, which was addressed in Kirkman. That's correct, Your Honor. We are not and cannot run from that reality. This is a single eyewitness case. The case begins and ends with Willie Johnson, and there or for him to have been convicted in the first place. I think that's 100% correct, and we have to embrace that reality. And you're not declaring that, or suggesting even, that the state, back at the time of the trial, knew that Johnson was, from your standpoint, giving false testimony, are you? No, not at all. We don't. We have no Brady claim or any claims that deal with that issue. Well, that's the challenge, isn't it? That's what Justice Scalia was talking about in his dissenting opinion in the Davis order, where your case is almost a hypothetical, procedurally perfect trial, where nobody violates Brady, nobody violates anything. And yet, because of the limitations of human decision-making, I suppose, an actually innocent individual is convicted. And the justices have debated that. I mean, you can count noses and find majorities who have said it would nonetheless, at least in a capital case, it would be a violation of our most fundamental principles of justice to execute somebody who we know to be actually innocent, even though there was no procedural glitch. You don't, fortunately, have a capital case in front of you, but you have a very long sentence for your client. So you're extending it from capital to other, and you're also, again, asking us to take this important step. So anyway, it's a big ask. Let me clarify, because time is waning, one really nitpicky procedural thing. You are making your claim under the 2254 D-2 branch, right? That's correct, Your Honor. So I take it that your understanding is that is, in a sense, standalone, and your argument is that this contrary to or unreasonable application of language of D-1 doesn't apply to D-2 cases? That's correct, Your Honor. We take D-2 as being a separate standard, and combining that with Herrera and the applicable standards, of course, the deference that is in the statute as well, that's afforded to the State Court. But D-2 is standalone because it's just unreasonable determination of the facts, confining oneself to the State Court proceeding, of course. That's D-2. Yes. Yes, Your Honor. It is our contention that, certainly, it is the State Court that failed in its analysis of Willie Johnson's new testimony in 2011. It's worth noting, Your Honors, that the trial judge who reviewed that testimony was not the judge who reviewed Mr. Johnson's testimony at trial. It was a different judge. So there isn't a side-by-side comparison in terms of credibility to be sort of afforded to the judge in that circumstance. That being said, he did have this new testimony before him, and it's our contention that the testimony on the most salient point, which is, did Cedric, Mr. Kell, the person who actually shot and killed Cedric Heron and Sammy Walker and actually harmed this victim? And the answer to that is no, according to Willie Johnson. Because Mr. Kell brings this as a D-2 case, right, you run right into, I think, what you acknowledged earlier to your credit, that it gets very difficult, if not impossible, to distinguish Kirkman. Because Kirkman looked at this under that presumption of E-1 and expressly determined, you know, that the finding of facts by the Illinois trial court in the first instance and then reviewed by the circuit court, there's nothing unreasonable about them. Yes, that's right, Your Honor, and our contention is that that decision is not correct, given the record, and perhaps there's an issue around the focus on the facts that we are walking into, perhaps a little more head-on than they had to do in Kirkman, in that we are raising this in the scope of an actual innocence case. Your Honors, I see my time is up, so I will reserve the remaining minute for rebuttal. All right, thank you. Ms. O'Connell. Good morning. May it please the Court, I'm Assistant Attorney General Erin O'Connell on behalf of the Respondent. This Court should adhere to its earlier decision in May in Petitioner's co-defendant's case. The issue there was identical on the factual issue as to whether the state court's determination of fact in rejecting the recantation was an unreasonable determination of fact, and whether the Petitioner could meet under E-1 his burden of overcoming this presumptively correct determination with clear and convincing evidence. So do you see D-2 as a gateway to the E-1 hearing? So this Court has said that where there's a D-2 claim, E-1 essentially provides the mechanism for proving the entitlement to relief under D-2. This is a quintessential E-1 determination. It was a credibility determination squarely based on an evaluation of Johnson's credibility at the hearing. The judge who heard his recantation testimony didn't believe that it was true. He listed a number of factors. The Court then on appellate review of that was not manifestly erroneous, and it cited the same factors. Kerkman, reviewing those determinations, found that those were a reasonable determination of fact. And this Court would need to disagree with the previous panel to find that Cal can meet D-2, but Kerkman could not. The legal issue there, the issue... I mean, that's not, of course, an impossibility. It's certainly something we strive not to do. I mean, if the courts do as they do, and in the face of uncertainty, we defer to the state courts, even without the extra language of D-1, habeas corpus in general has always been a very deferential procedure. But it's not actually impossible. The one thing that's very troubling about this is that people who are, as it were, lucky enough to have their convictions based on DNA evidence or based on, you know, whatever, any kind of physical evidence, have a much better chance of showing actual innocence than people whose convictions are based on the least reliable of testimony, that is from eyewitnesses. And it seems actually rather perverse. Well, I think a threshold consideration in an innocence case, and this has been applied in the context of excusing a procedural default, is evidence that the petitioner comes forward with has to be new and especially reliable evidence. And certainly, DNA evidence would most clearly meet that standard. This court has noted that there are other types of cases where that would be the case, and say there was circumstantial evidence making it a physical impossibility, proving that a defendant had been outside of the state at the time of the crime, that would also potentially meet the standard. Here we have a recantation, and this court, and frankly every court to address the issue, has recognized that a recantation is especially suspect. And in particular, a recantation that comes 15 years after the trial in the case. These tend to be easier for people to obtain, you know, an investigator. In this case, the factual background is that an investigator did find Johnson when he was in Texas and persuaded him to sign the affidavit recanting the testimony. Ms. O'Connell, did Mr. Johnson ever back away from that proceedings, or is he stuck with that recantation throughout? So, the proceedings relied on a statutory provision where the only issue is if there is diametrically opposed testimony given under oath that shows that one of two accounts was false. Neither the state nor defendant in that case has to argue about which version was true and which version was false. The fact that there are the two diametrically opposed versions proves that there was perjury at one of the two proceedings. He did plead guilty in that case. Clearly, he really had no defense. He had provided contradictory testimony. So, he was not, neither the state nor Johnson at that proceeding had to elect which of the two versions was true. But that doesn't quite answer Judge St. Eve's question. You know, that said, has he at any point recanted the recantation or cast any shadow on the recantation? No, he has not, but my point was just that he, it was over with at the time that he provided the recantation testimony. His coming forward would have had no benefit to himself in that proceeding. It wouldn't have been a charge. But that doesn't stop defendants from adding things that, at a guilty plea or at a sentencing, that wouldn't, that doesn't necessarily stop it. So, I was wondering, it didn't see anything in the record as to whether or not Mr. Johnson is now or subsequent to that recantation, recanting the recantation or, or backing away from it in any way. And no, there is nothing in the record showing that he has attempted to take back the recantation. Ms. O'Connell, can you, can you react to this? One of the, one of the things in preparing for this that I found a little bit startling was the Illinois Appellate Court says that the, or agreed that the, the recanting by Mr. Johnson was internally inconsistent and implausible. That's the language that was used. And I thought to myself when I read it, wow, we must have some real whoppers coming here. And instead, what you get are things like, well, there was no phone at the, in the hospital room. In other words, it seems like small stuff. And how, how, how, how is that materially inconsistent or materially implausible? I mean, there's been a lot of time pass. Correct. So fundamentally, the question was whether Johnson had volunteered the identification of Kirkman and the co-defendant in the emergency room as he claimed. There was contradictory testimony from petitioner's own witness that undercut his claim that what had police asked him to confirm whether it was petitioner and what he was calling. Were you talking about the girlfriend? Exactly. So the sequence of events, his claim, Johnson's claim, is that he was presented with the story that had been offered by the girlfriend that she had initially named these two parties and he went along with it. Completely contradictory testimony at the hearing saying, no, it didn't come from me. Johnson is the one that told me initially that Duke and, you know, petitioner, I don't think by name, but that these were the perpetrators. So that was a fundamental inconsistency and it was a crucial issue as to how this allegedly false identification came about. The inconsistencies went beyond that. So one crucial inconsistency was between Johnson's affidavit and Johnson's evidentiary hearing testimony. And this went to the why of why he would falsely identify these two individuals. The affidavit claimed that he wanted to leave his options open, essentially, to take revenge on his own. He wanted to go after this Ford. He had had, you know, a dispute with Ford in the past. He knew who he was. He wanted to take care of it in the streets was, I think, the language used in the affidavit. In the evidentiary hearing testimony, he gave a different account, which was that he was so fearful of Ford that he wanted to identify these two other individuals so that Ford would not come after him in the future. This was another key inconsistency that really went to the central question of this. Are those really inconsistent, though, Ms. O'Connell? They're definitely different, but are they inconsistent? Inconsistent suggests to me conflicting as opposed to just two different reasons. I think they do conflict in that if he was fearful to begin with, he would not be talking about taking out revenge on the person that he feared. Why do you think that? I mean, I read that as he was keeping his options open and the last thing he wanted for the police to be involved in it. So he was, what he chooses to do in the end is flee to Texas, which is actually quite a ways from here. But, you know, I thought inconsistent was a very strong word to use for these discrepancies, which struck me as minor. And the petitioner has advanced a theory in which the two motives can be reconciled. I would just urge the court on this habeas review of the factual determination that it has to be more than there, it could go different ways. It has to actually be objectively unreasonable for this court to grant habeas relief. This court correctly determined in Kirkman that Johnson's recantation, the finding that it was false is not unreasonable. And we would ask that this court affirm. All right, thank you very much. Ms. Mahada. Thank you, Your Honors. I will answer the question that was put forth earlier, I think, by Justice St. Eve, which is Mr. Johnson has never backed down from that recantation despite prosecution, incarceration for I think it was some period of three years. He never backed away from that. This prosecution was so abhorrent, in fact, that leading lights of the legal community, including former prosecutors and judges, were appalled by it. And that's a feature certainly of the statute. But it is credit to Mr. Johnson that he did not back down for that. And what he did in this case was not merely provide a recantation. Yes, there is skepticism in Illinois law and across the country on recantations. He provided affirmative exonerating evidence on the one thing that mattered, who killed his friends and who shot him. On that point, he was unassailable. He did not change that testimony. And to the extent there were any inconsistencies, they were minor. They were explicable. He had varying motivations for why he had to come forward, why it was safer for him to come forward and why he could not do so then. So, Your Honor, we would ask that this court, um, affirm we are aware that this is sorry, reverse. We were aware that this is an extraordinary case. Um, and, uh, we certainly are mindful of the high standard in here, but we think this case meets that standard. Thank you, Your Honors. All right. Thank you very much. Thanks to both counsel. The court will take the case under advisement.